STATE OF CONNECTICUT *v.* FRANCIS F. ZUKAUSKAS.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued November 6—decided December 11, 1945.

*Edward T. Carmody,* public defender, and *William W. Gager,* special assistant to the public defender, for the appellant (defendant).

*William B. Fitzgerald,* state's attorney, with whom was *Walter W. Smyth,* assistant state's attorney, for the appellee (state).

JENNINGS, J. The defendant was convicted of first degree murder by a statutory court consisting of three judges and has appealed. He claims that the evidence does not support the conclusion that he was proven guilty beyond a reasonable doubt and assigns as error certain rulings admitting in evidence statements made by him out of court.

The defendant murdered his mistress. This is admitted. He attacks the findings and the conclusions of the trial court, but the ultimate question is presented by his claim that he could not, upon all of the evidence, properly be found guilty of the crime of murder in the first degree beyond a reasonable doubt. *State* v. *Cots,* 126 Conn. 48, 53, 9 Atl. (2d) 138. The evidence shown by the finding to have been believed by the court, supplemented by inferences it could reasonably draw, may be summarized as follows: Both the defendant and the deceased were married and had children. The deceased had been the mistress of the defendant for over a year before the killing. He had been working in a factory but had secured an appointment as supernumerary policeman in Waterbury and, on July 2, 1944, had been given regular work as such. His life ambition had been to work as a policeman. Sexual relations between the defendant and the deceased terminated about September 1, 1944. He learned that she was going around with another man but still wished to continue his illicit relationship with her. She had left her home and was living with a girl companion. He succeeded in seeing her only once or twice in September and October.

On November 1, 1944, he donned his uniform and

started for the bus to report for the 11 o'clock night shift. On the way he met the deceased, who was waiting for him in her husband's car. They engaged in an argument in which she upbraided him because of his attempts to make trouble between her and her new friend, but at its conclusion neither was angry. He then got into the car and she drove him back to his home. He went upstairs and, although he was carrying his .38 caliber service revolver, he took from a drawer and loaded two .32 caliber revolvers, intending to shoot and kill the deceased. He got into the car and, as it started, fired several shots from one of the latter revolvers into her body and then beat her on the head with it. The car came to a stop a short distance from his house.

The wife of the defendant heard the commotion, came downstairs and took the woman up to her apartment, where she rendered her first aid. The defendant joined them there and all three then went back downstairs and entered the car, which the defendant drove in the direction of the Waterbury Hospital. The deceased was sitting on the front seat with the defendant and the latter's wife was in the back seat. Before reaching the hospital, the defendant turned the car around and drove it to the vicinity of the Bradley Avenue dump with the intent and for the purpose of shooting and killing the deceased. There, while the car was still being driven by the defendant, he drew the second .32 caliber revolver and fired a number of bullets into the head, face and neck of the deceased, one of which caused her death. He then drove to an isolated section of Middlebury and threw the body of the deceased out of the car. He spent some time that night and the next morning in attempts to conceal the body, the clothing and other evidence of his crime.

The finding is supported by the evidence in every material respect.

The claim of the defendant on this phase of the case is that his actions subsequent to the first shooting do not furnish a sufficient basis for finding him guilty of first degree murder because of the lack of sufficient proof that it was wilful, deliberate and premeditated. He claims that he was going to take the deceased to the hospital, that he turned around at her request that he take her to her mother's home, and that these claimed facts show an absence of any intention to kill her at that time, whatever his intentions may have been at the time of the first shooting. The finding makes clear that the court did not believe his testimony to this effect. His statement to the coroner that his intention to use the revolvers on the deceased was formed when he went upstairs to get them and his subsequent use of both of them and not his service revolver for the purpose of killing her under the circumstances described are ample to sustain this basic conclusion of the trial court. Even if the original intention of the defendant had been abandoned after the first shooting, a conclusion that the second shooting was wilful, deliberate and premeditated could not be held erroneous as a matter of law in view of the condition of the victim, suffering from the serious injuries inflicted on her in the first shooting, and the lack of any sufficient provocation. Time is not important as long as there is time to form the intent. *State* v. *Smith*, 49 Conn. 376, 389; *State* v. *Simborski*, 120 Conn. 624, 629, 182 Atl. 221. There is also a difference, in the length of time reasonably required, between a killing resulting from unforeseen circumstances and one for which the killer has prepared himself by getting and loading two revolvers. *State* v. *Palko*, 121 Conn. 669, 673, 186 Atl. 657. The claim of the de-

fendant that he was provoked beyond endurance by the language of the deceased is without merit. See *State* v. *Buonomo*, 88 Conn. 177, 180, 90 Atl. 225. In motive and manner of execution this case resembles *State* v. *Dodez*, 120 Conn. 216, 179 Atl. 653, in which a claim similar to the one advanced in the case at bar was made and overruled. The assignment of error under consideration cannot avail the defendant. See *State* v. *Schutte*, 97 Conn. 462, 464, 117 Atl. 508.

Additional facts must now be stated preliminary to a discussion of the remaining claim of the defendant, that the admission in evidence of statements and confessions made by him was erroneous. The events on which the defendant relies may be summarized as follows: On Thursday, November 2, the day after the murder, the defendant learned that Chief Inspector Bendler wanted to see him, and voluntarily went to police headquarters. He was questioned by Bendler in his office from 4:15 to 5 p.m. During this conversation the defendant admitted that he had committed a breach of peace. Bendler telephoned the prosecuting attorney of the City Court and, as a result of that conversation, informed the defendant that he was under arrest. He was booked under the charge of breach of the peace and the amount of bail was specified. On three occasions that evening the defendant was briefly interviewed by detectives and was given the paraffin test. The next morning he was presented in the City Court on a charge of breach of the peace and the case was continued to November 17 under bonds of $10,000. The signed complaint charging this crime was in the hands of the prosecuting attorney at that time. The warrant was not made out or signed. Thereafter, at the request of the defendant, a police officer telephoned to three friends of the defendant in an unsuccessful attempt to secure bail. Bendler again interviewed the

defendant briefly at 9:30 a.m., and at 4 p.m. the coroner, accompanied by a stenographer, questioned him for an hour. The coroner thereupon lodged a coroner's warrant against him with the desk officer. At 8 p.m. two detectives questioned him for fifteen minutes, and at 11 p.m. a friend, accompanied by the coroner, visited him. Saturday morning, November 4, Bendler questioned him for an hour and a half, and after this interview he was again questioned by the coroner with a stenographer present. The City Court warrant referred to was never made out, signed or served on the defendant, and the coroner's warrant was never served on him.

Both in the statements made to the city detectives, county detective Laden, and the coroner and in his testimony in court, the defendant described the events of November 1 and 2 in much greater detail than appears in the summary herein. The defendant does not claim that these statements were extracted from him by the use or threat of physical force or other methods of compulsion. He had been connected with the police force for at least two years and knew the officers and the coroner personally. He and the coroner called each other by their first names. He appears to have been treated with consideration. He was kept in the ordinary police cell between interviews and his examination was intensive, but it was free from those objectionable features which are usually referred to as third-degree methods. Police officers have been criticized by the courts so often and so severely because of the high pressure methods used by them in securing confessions that it is a pleasure to note the propriety and skill with which this operation was conducted.

The defendant substantially admits that the statements made by him were voluntary but claims that they should not have been admitted because they were

made while he was illegally detained and thus were obtained by illegal means. His claim of illegality is based on the failure to issue the City Court warrant and the failure to serve the coroner's warrant formally. His principal reliance is on the recent federal cases of *McNabb* v. *United States,* 318 U. S. 332, 341, 63 Sup. Ct. 608, and *Anderson* v. *United States,* 318 U. S. 350, 63 Sup. Ct. 599. Those cases held that statements made by an accused while illegally detained were inadmissible. The subsequent history of the *McNabb* case is not without interest. A motion to reargue was made and denied, but with the statement that the court was not precluded from hearing further testimony as to the admissibility of the confession. *McNabb* v. *United States,* 319 U. S. 784, 63 Sup. Ct. 1322. The case was retried and the confession admitted. *McNabb* v. *United States,* 142 Fed. (2d) 904.

It is unnecessary for the purposes of this appeal to distinguish between admissions and confessions. No time will be spent in discussing the Connecticut doctrine that objects, even if illegally obtained, are nevertheless admissible against an accused; *State* v. *Reynolds,* 101 Conn. 224, 231, 125 Atl. 636; nor that ordinarily statements by an accused while in custody are admissible; *State* v. *Palko,* supra, 679; *McNabb* v. *United States,* 318 U. S. 332, 346, 63 Sup. Ct. 608; *United States* v. *Mitchell,* 322 U. S. 65, 69, 64 Sup. Ct. 896; *Lyons* v. *Oklahoma,* 322 U. S. 596, 601, 64 Sup. Ct. 1208. Any discussion of these claims of the state is unnecessary because the Supreme Court of the United States has itself limited the application of the doctrine relied on by the defendant. In *United States* v. *Mitchell,* supra, a confession made by an accused after his arrest was held admissible even though he was thereafter unlawfully detained by federal agents for several days.

Examination of the federal cases decided since the *McNabb* and *Anderson* cases shows that these cases caused considerable confusion and uncertainty in the application of the rule relating to the admissibility of confessions. That rule, before the decision of these cases, was, in the federal courts as elsewhere, that the criterion of admissibility was the voluntary character of the confession. *Lisenba* v. *California,* 314 U. S. 219, 239, 62 Sup. Ct. 280; *Palko* v. *Connecticut,* 302 U. S. 319, 326, 58 Sup. Ct. 149; *State* v. *Palko,* supra, 680. The fact that an accused was illegally detained when the confession was made did not render it inadmissible unless that fact was causally connected with the securing of the confession. *State* v. *Cross,* 72 Conn. 722, 728, 46 Atl. 148; *People* v. *Vinci,* 295 Ill. 419, 425, 129 N. E. 193; *State* v. *Exum,* 213 N. C. 16, 22, 195 S. E. 7; *Balbo* v. *People,* 80 N. Y. 484, 498; notes, 27 L.R.A. (N.S.) 151; 50 id. 1084; 94 A.L.R. 1036; 22 C. J. S., p. 1432; 20 Am. Jur. 431; 2 Wharton, Criminal Evidence (11th Ed.), pp. 1023, 1068. His illegal detention is, however, relevant to the issue. *People* v. *Alex,* 265 N. Y. 192, 194, 192 N. E. 289.

The *Mitchell* case, supra, was brought to the Supreme Court by certiorari for the specific purpose of explaining the proper application of the rule enunciated in the *McNabb* case. It, too, left something to be desired in the way of definiteness. See the dissenting opinions in these cases and in *Ashcraft* v. *Tennessee,* 322 U. S. 143, 156, 64 S. C. 921. Be that as it may, the net result has not materially changed the rule that the sole circumstance of illegal detention does not necessarily invalidate a confession unless the illegal character of the detention has some causal relation to the procurement of the confession. The following federal cases, decided since the *Mitchell* case, so hold: *Sykes* v. *United States,* 143 Fed. (2d) 140; *United*

*States* v. *Pape,* 144 Fed. (2d) 778, 780; *Ruhl* v. *United States,* 148 Fed. (2d) 173, 175; *United States* v. *Ebeling,* 146 Fed. (2d) 254, 256; *United States* v. *Heitner,* 149 Fed. (2d) 105, 106; *United States* v. *Klee,* 50 Fed. Sup. 679; as do the following state decisions, subsequent to the *McNabb* case: *Commonwealth* v. *Mayhew,* 297 Ky. 172, 178 S. W. (2d) 928, 932; *People* v. *Malinski,* 292 N. Y. 360, 371, 55 N. E. (2d) 353. The *McNabb* and *Anderson* cases are fully analyzed and annotated in 53 Yale Law Journal 758.

The defendant apparently does not claim that the *McNabb* case is controlling on this court in deciding the case at bar but that it "presents an opportunity for the exercise of judicial and ethical standards of the highest nature." This court is not unmindful of those standards, as its decisions demonstrate. See for example, *State* v. *Ferrone,* 96 Conn. 160, 113 Atl. 452; s. c., 97 Conn. 258, 116 Atl. 336. Society, as well as this defendant, is entitled to equal protection of the law and to due process of law, however, and, on the admitted facts, this defendant is entitled to no more. 3 Wigmore, Evidence (3d Ed.), p. 319. There is a respectable body of opinion which holds that the rule stated goes too far in favoring criminals. See *Palko* v. *Connecticut,* supra, 325. In any event, the lack of causal connection between the illegality of the detention and the statements and confessions in the case at bar is clear. The defendant was presented in court promptly and bail was fixed. His friends were called and one of them came to see him. It does not appear that he even knew that he was illegally detained. The illegality was of a most technical character. The defendant substantially admits that the confessions were voluntary. In view of the general doctrine regulating the admission of voluntary confessions, the appeal of the defendant to the constitutional prohibition

against requiring an accused to give evidence against himself must fail. *State* v. *Palko,* supra, 680. As far as can be ascertained from the printed record, the court exercised its discretion wisely in admitting the confessions.

There is no error.

In this opinion the other judges concurred.