STATE OF CONNECTICUT *v.* JOSEPH L. TABORSKY

STATE OF CONNECTICUT *v.* ARTHUR CULOMBE

BALDWIN, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

196

Argued January 8—decided February 16, 1960

*Wallace R. Burke,* special public defender, with whom were *John J. Daly,* assistant to the special public defender, and *Maxwell Heiman,* for the appellant (defendant) in the first case.

*Alexander A. Goldfarb,* special public defender, for the appellant (defendant) in the second case.

*John D. LaBelle,* state's attorney, for the appellee (state) in each case; with him, on the brief in the

second case, were *J. Read Murphy* and *George D. Stoughton,* assistant state's attorneys.

BALDWIN, C. J. The defendants, Joseph L. Taborsky and Arthur Culombe, were convicted of murder in the first degree in a joint trial to a jury in the Superior Court. They were indicted under what is now § 53-9 of the General Statutes for the killing of Edward J. Kurpiewski and Daniel J. Janowski, committed during a holdup at a gasoline station in New Britain on December 15, 1956. The defendants, in their appeals, have assigned error in the rulings of the court preliminary to the trial, in the admission of their confessions and other evidence during the trial, in the charge, and in the denial of their motions to set aside the verdicts of guilty.

On December 15, 1956, the bodies of Edward J. Kurpiewski and Daniel J. Janowski were found in Kurp's gasoline station on Stanley Street in New Britain. An autopsy revealed that both had died from bullet wounds in the head. In the afternoon of February 23, 1957, the defendants were taken into custody by the state police. Culombe, on February 27, and Taborsky, on March 1, confessed to robberies at the gasoline station and to the two homicides. Each confession corroborated the other in the main. A general summary of the facts contained in them follows: About 6 p.m. on Saturday, December 15, 1956, the defendants drove in Culombe's Oldsmobile from Hartford to New Britain. They were armed and they intended to hold up a gasoline station. They stopped at Kurp's station. The proprietor, Kurpiewski, serviced their car. Taborsky left the car to go, as he said, to the toilet in the station. After Culombe had paid for the gasoline, he ordered Kurpiewski, at gun point, into the

boiler room of the station, shot him, and took his wallet. Meanwhile, Taborsky was searching the main office of the station for money. Culombe joined him and they found and took money from the cash register and the desk. During this search Janowski, who had his eighteen-month-old daughter with him, drove up and stopped by the pumps. Taborsky and Culombe waited in the station, but when Janowski did not drive away they came out. Culombe pretended to service Janowski's car. Taborsky pointed a gun at Janowski, took his wallet and ordered him into the station and then into the toilet room, where Taborsky shot him twice in the left side of the head above the ear. Taborsky and Culombe then drove to Culombe's house in Hartford and divided the money. Taborsky returned later that evening to his home in Brooklyn, New York.

Before the trial began, Taborsky filed a motion for a separate trial which the court denied. This action is assigned as error. Taborsky claimed that the defense to be offered by Culombe would be antagonistic to his defense and that Culombe's confession, if admitted in evidence, would be prejudicial to him. Whether separate trials should be allowed rests in the sound discretion of the trial court. *State* v. *McCarthy,* 133 Conn. 171, 174, 49 A.2d 594; *State* v. *Luria,* 100 Conn. 207, 209, 123 A. 378; *State* v. *Klein,* 97 Conn. 321, 323, 116 A. 596; *State* v. *Castelli,* 92 Conn. 58, 62, 101 A. 476; *State* v. *Brauneis,* 84 Conn. 222, 226, 79 A. 70. In each confession, most of the material facts were substantially the same as in the other. See *People* v. *Doran,* 246 N.Y. 409, 425, 159 N.E. 379; *People* v. *Fisher,* 340 Ill. 216, 227, 172 N.E. 743; *State* v. *Rios,* 17 N.J. 572, 585, 112 A.2d 247; *Kirkendoll* v. *State,* 198 Tenn. 497, 522, 281 S.W.2d 243; *Opper* v. *United States,* 348 U.S. 84, 95,

75 S. Ct. 158, 99 L. Ed. 101. Each confession, if legally corroborated, was sufficient to convict the defendant making it of murder in the first degree. An examination of all the testimony in the joint appendix to the briefs discloses no material fact incriminating either of the defendants which would not have been before the jury if he had been tried separately and only his own confession admitted. See *State* v. *Castelli,* supra, 64. The court was meticulous in cautioning the jury many times during the trial, especially when the counsel for either Taborsky or Culombe made objection, that each confession was to be considered by the jury only in the state's case against the defendant who had made it. See *State* v. *McCarthy,* supra, 175; *State* v. *Castelli,* supra, 63. This caution was repeated in the charge to the jury. Upon the whole record, it does not appear that any injustice was done to Taborsky by the denial of his motion for a separate trial.

Both defendants moved for a change of venue. General Statutes § 54-78. Prior to their apprehension by the police, there had been a series of holdup killings which had particularly aroused the fears of the operators of gasoline stations, package stores and small shops. Newspapers and radio and television networks throughout the state published and broadcast news of these crimes and referred to those perpetrating them as "mad killers." The court conducted a lengthy hearing on this feature of the cases. Editors of newspapers, radio broadcasters and many others testified, and a number of newspaper files were received as exhibits. While some of the witnesses stated that the public were aroused against the defendants after they had confessed, by far the greater number testified to facts from which a conclusion could reasonably be drawn that a fair trial

could be had in Hartford County. The court concluded that the defendants had failed to sustain the burden of proving, as the law requires them to do, that a fair and impartial trial could not be had in Hartford County. *State* v. *Chapman,* 103 Conn. 453, 470, 130 A. 899; *State* v. *Rocco,* 109 Conn. 571, 572, 145 A. 47; *State* v. *Rogers,* 143 Conn. 167, 172, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476; 4 Wharton, Criminal Law and Procedure, p. 114. The court did not abuse its discretion in denying the motions for a change of venue.

The defendants claim that they were denied counsel in violation of the fourteenth amendment to the federal constitution and article first, § 9, of the constitution of this state. They were taken into custody by the state police on Saturday afternoon, February 23. On February 25, they were taken by the state police to police headquarters in New Britain, where they were booked for breach of the peace. They were presented in the Police Court in New Britain on February 26, when their cases were continued until March 5 without plea. On February 28, bench warrants having been served upon them charging them with murder in the first degree, they were presented in the Superior Court in Hartford. The court ordered them placed in the custody of the state police for further investigation. Before this was done, however, the defendants were asked whether they had counsel. It appearing that they did not and that they were without funds to provide any, the court offered to assign counsel to them. Taborsky stated that he did not want the public defender. He asked for Attorney Nathaniel Bergman or, if he was not available, Attorney Wallace R. Burke. Bergman not being able to undertake the case, Burke was assigned as counsel. Culombe also

refused the services of the public defender and asked that Attorney Thomas McDonough be appointed to defend him. The court appointed McDonough.[1] Provision is made by law for the appointment by the judges of a public defender to act in behalf of accused persons who are unable to provide counsel for themselves. General Statutes § 54-80; *State* v. *Reid*, 146 Conn. 227, 234, 149 A.2d 698. Nevertheless, each of these defendants was provided with counsel of his own choice who acted as a special public defender at the expense of the state. § 54-81. Although an accused who cannot provide counsel for himself is entitled to competent representation, there is nothing in our law which requires that he be given a choice of counsel.

The finding made by the court concerning the admissibility of Taborsky's confession shows that Taborsky did not ask for an attorney until he was presented in the Superior Court on February 28. The finding made in the Culombe case concerning the admissibility of his confession shows that Culombe, almost from the time of his first contact with the police concerning the New Britain murders, had abundant opportunity to call an attorney; for example, the police offered to call any attorney whom Culombe would name, but he named none; he was taken to his house by the police and there talked with his wife; she also saw him at state police headquarters. Taborsky claims that he should have been provided with counsel in time for the counsel to represent him at his presentation in the Superior Court on February 28. Culombe appears to assume that immediately upon his apprehension he should

---

[1] After the trial and during the pendency of the appeal, McDonough died. Alexander A. Goldfarb was appointed special public defender in his place.

have been offered counsel by the state. His appearance for booking at the police headquarters in New Britain was not a hearing, and for it he did not require counsel. His presentation in the Police Court in New Britain without counsel, when his case was continued, in no way jeopardized his rights. He was not required to, nor did he, enter any plea, nor was he called upon to do or say anything. See *State* v. *Reid,* supra, 235. The "refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, *Chandler* v. *Fretag* [348 U.S. 3, 9, 75 S. Ct. 1, 99 L. Ed. 4] but also if he is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice.' *Lisenba* v. *California,* 314 U.S. 219, 236 [62 S. Ct. 280, 86 L. Ed. 166] (1941). Cf. *Moore* v. *Michigan,* 355 U.S. 155, 160 [78 S. Ct. 191, 2 L. Ed. 2d 167] (1957). The latter determination necessarily depends upon all the circumstances of the case." *Crooker* v. *California,* 357 U.S. 433, 439, 78 S. Ct. 1287, 2 L. Ed. 2d 1448; see annot. at 2 L. Ed. 2d 1644, 1646.

The claim that the defendants were deprived of counsel while they were held in custody for questioning has a direct bearing upon the admissibility of their confessions, a matter which will be discussed hereinafter. General Statutes § 6-49 provides for an arrest without warrant when the police have reasonable grounds to believe that a felony has been committed. Law enforcement problems vary widely in the several states, and state enforcement is accorded some latitude when an alleged violation of the due process clause of the federal constitution is

under consideration. *Cicenia* v. *Lagay,* 357 U.S. 504, 510, 78 S. Ct. 1297, 2 L. Ed. 2d 1523. In the course of their investigation of the series of robberies and homicides in the locality of Hartford, the police had reasonable grounds for believing that these defendants were implicated in a felony or felonies and for apprehending and holding them in custody. Under the law, an accused is entitled to counsel to aid him in his defense, not to prevent voluntary action on his part. *State* v. *Bunk,* 4 N.J. 461, 470, 73 A.2d 249. The question is whether, during the investigation and questioning of a person suspected, there was an unreasonable delay in his obtaining counsel or whether he was forced to plea without the benefit of professional legal advice and whether, as a result, the opportunity for a fair trial was denied him. Once legal counsel is obtained, any illegality in the prior proceedings can be raised and the accused's rights fully protected. In the instant cases, the counsel who were furnished to these defendants pressed with ability and vigor, not only to the court on the preliminary hearing on the admissibility of the defendants' confessions, but also to the jury on the trial, alleged illegality in the failure to provide counsel as well as in the methods by which the confessions were obtained. Upon the records, we conclude that the defendants were not unlawfully denied counsel.

The defendants assign error in the admission of their confessions in evidence. Taborsky claims that as to him the confession of Culombe was hearsay. The court so treated it and cautioned the jury time and again that they were to consider Culombe's statements only in connection with the charge against him. This phase of the admission of Culombe's confession was discussed when we were considering Taborsky's motion for a separate trial and

requires no further elaboration. The defendants claim that the confessions were not voluntary but were secured by duress, threats and psychological pressure. Before the confessions were admitted in evidence, the court, in the absence of the jury, conducted a preliminary hearing which consumed five full court days. Police officers, jail guards, and the jail physician concerned with the defendants' questioning and custody were examined at length. The defendants themselves took the stand, as did Culombe's wife. The following facts were properly found by the court: State police officers Frederick Moran and Eugene Griffin, on Saturday, February 23, 1957, at 2:10 p.m., saw the defendants leaving the home of Taborsky's mother on Park Terrace in Hartford to enter Culombe's car. The officers asked Taborsky to accompany them to state police headquarters to talk with Lieutenant Samuel Rome. Taborsky got into Culombe's car and was driven to headquarters. He went in and Culombe drove off. Detective Sergeant Donald Paige and Officer Robert Reimer went to Culombe's home at 20 Coleman Drive in Hartford. On their arrival, Culombe's wife said that he was in the toilet. While waiting, the officers heard metallic sounds coming from that direction. They took Culombe to police headquarters. There, both defendants agreed to accompany the officers. For purposes of identification, they were taken to a store in Coventry and to a package store in Rocky Hill. After they had supper, they returned with the police to headquarters. Lieutenant Rome questioned Taborsky for some time and then locked him in a cell.

Culombe told Sergeant Paige, one of the officers who had accompanied him on the trip, that he was a gun collector and that he had seven or eight guns

which he would turn over to the police. Sergeant Paige then took Culombe to the latter's house. Culombe went to the toilet and then to his bedroom, where the officers found him with two guns, one of .25 caliber and the other of .38 caliber. They also found a clip of .25 caliber cartridges and, in a small safe, six guns and three boxes of ammunition. Back at police headquarters, Culombe was questioned further by Lieutenant Rome and Sergeant Paige and then placed in a cell for the night. The questioning covered the New Britain crimes and others under investigation. On Sunday, February 24, both Taborsky and Culombe were questioned again. On Monday, February 25, Culombe told Lieutenant Rome that he wanted a lawyer but refused to name a particular one. Rome told him that he could have a lawyer if he would say which one he wanted called. On the same day, both defendants were booked at New Britain police headquarters on charges of breach of the peace and held for their appearance in the Police Court the next day. On Tuesday, February 26, they were presented in that court and their cases were continued under bond. Afterwards, Taborsky was again questioned by Lieutenant Rome and then taken to the Hartford County jail under a mittimus from the New Britain court. Taborsky remained in jail until Thursday, February 28, when he was brought to state police headquarters in Hartford. There a bench warrant for appearance in the Superior Court was served upon him.

On Wednesday, February 27, in the afternoon, Sergeant Paige and Detective Robert Murphy of the state police questioned Culombe at police headquarters concerning the New Britain and other crimes. Culombe stated that the police "were looking for four guns, two of which would be under wa-

ter, and were looking for two men and that he himself had not done any killing." Culombe then agreed to show the officers where the guns were. Lieutenant Rome, Sergeant Paige, Detective Murphy and Detective Vincent O'Brien went with Culombe in a police car to Culombe's house. On the way, Culombe related the facts substantially as contained in his confession, outlined hereinbefore, except that he claimed that Taborsky, and not he, had shot Kurpiewski in the boiler room of the gasoline station. At Culombe's house, the officers removed the medicine cabinet from the wall in the toilet room and found, in a brief case between the walls, a gun and two blackjacks. They also found, in a safe, a metal box with some parts of a gun. At Culombe's direction, they recovered from a swamp at Dexter and Reed Avenues in Hartford a raincoat with human bloodstains on it. Culombe stated it belonged to him and was worn by Taborsky on the night they went to New Britain. While at his house, Culombe said to his wife that he had told a true story to the police and that he might get life but Taborsky would get the chair. The officers, at Culombe's suggestion, then went with Culombe to the intersection of Newfield and Dexter Avenues in Hartford. Pointing to a pond, he said that two guns could be found there and that the gun parts in the metal box would fit one of the guns. Culombe directed the officers to a service station, where he pointed out a 1949 black Oldsmobile which he said was previously owned by him and was used the night he and Taborsky went to New Britain. Later, at state police headquarters, Culombe admitted that he had participated in the New Britain crime. That evening he signed a written confession which described two holdups, including the one in New Britain. Later, he signed another statement

which described only the New Britain holdup. Culombe saw his wife at the house and at least twice at police headquarters after he was taken into custody and before his confession. He said nothing to her, however, about getting an attorney.

On Thursday morning, February 28, Culombe was served with a bench warrant charging him with murder. He was then presented in the Superior Court. The court informed him that the police wished to investigate further the charges against him and that he had the right to remain silent if he wished. Culombe said that he would co-operate with the police and, as related hereinbefore, that he wanted counsel. The court informed him that he could have an attorney of his own choice at state expense. On the evening of March 2, while he was in a cell at state police headquarters, Culombe called the officer who was watching him and offered to give the police some further information concerning the New Britain affair. He then admitted that it was he who followed Kurpiewski into the service station, forced him at gun point into the boiler room and shot him. This admission was later incorporated into another written statement which Culombe signed. Although Culombe claimed that the police had used his wife and children to force a confession from him, the trial court found that Mrs. Culombe had come voluntarily to police headquarters with her children, whom she did not want to leave at home alone, that she was attended by a policewoman and was well treated, and that at no time was she used, or were the children used, to bring pressure on Culombe.

When Taborsky was presented in the Superior Court on Thursday, February 28, the presiding judge told him that he was releasing him in the custody of the state police for the purpose of further

investigation, that he need make no statement, and that any statement which he did make could be used against him. The following day, Friday, March 1, Taborsky's mother came to state police headquarters at her own request. She told Taborsky that she wanted him to tell the truth and that he should tell his part of the story, because Culombe had put the blame on him. Taborsky then, in the presence of Lieutenant Rome and Officer Reimer, told his mother that at the Kurp gasoline station the other fellow killed the station attendant, that they both robbed him and that he, Taborsky, killed the customer and robbed him. Taborsky was questioned after his mother left. The questions and answers were taken in shorthand. A transcription of the notes was signed by Taborsky on March 3. When he was in the Police Court in New Britain on February 26 with his mother and sister, his mother had asked him if she should get a lawyer and he replied that he did not need a lawyer. Prior to his presentation in the Superior Court on February 28, Taborsky did not request counsel. The court ruled that the confessions of both defendants were voluntary and admitted the confessions in evidence.

A confession is not admissible in evidence unless it is voluntary. *State* v. *Castelli,* 92 Conn. 58, 67, 101 A. 476; *State* v. *Palko,* 121 Conn. 669, 680, 186 A. 657; *State* v. *Zukauskas,* 132 Conn. 450, 459, 45 A.2d 289; *State* v. *Malm,* 142 Conn. 113, 120, 111 A.2d 685; *State* v. *Rogers,* 143 Conn. 167, 173, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476; 2 Wharton, Criminal Evidence (12th Ed.) § 348. The issue is one of fact to be determined by the court in the exercise of a legal discretion, and its decision will not be disturbed unless that discretion has been abused. *State* v. *Lorain,* 141

Conn. 694, 699, 109 A.2d 504; *State* v. *DiBattista,* 110 Conn. 549, 562, 148 A. 664. The issue of admissibility is ordinarily resolved by the court after a preliminary hearing in the absence of the jury, the procedure followed in the instant cases. *State* v. *Lorain,* supra. The defendants claim that they were being illegally detained when the confessions were made. This cannot be true of Taborsky, because, before he confessed, he had been served with a bench warrant, had been presented in the Superior Court and warned of his rights, and had then been committed to the custody of the state police. Culombe, who confessed before his presentation in the Superior Court, was being held by the state police under § 6-49 of the General Statutes. That aside, there is nothing to indicate that either defendant at the time thought his detention to be illegal. Thus no irregularity in the detention, had there been any, could have induced, or contributed to the inducement of, the confession. *State* v. *Zukauskas,* supra, and authorities cited; *State* v. *Buteau,* 136 Conn. 113, 123, 68 A.2d 681, cert. denied, 339 U.S. 903, 70 S. Ct. 516, 94 L. Ed. 1332; 20 Am. Jur. 431, § 498. An examination of the record does not disclose that the confessions were induced by anything which would make them involuntary and, therefore, inadmissible. The trial court did not abuse its discretion and properly admitted the confessions in evidence.

The defendants have assigned error in the denial of their motions to dismiss the indictments. They claim that the evidence was insufficient to satisfy the requirements of the so-called two-witness rule. General Statutes § 54-83 provides that "[n]o person shall be convicted of any crime punishable by death without the testimony of at least two witnesses, or

that which is equivalent thereto." We have interpreted this statute to require "that the proof of all the essential elements of the capital crime charged (each of which must be proved beyond a reasonable doubt) shall not depend upon the testimony of one witness. If one or more witnesses testify to facts relevant and sufficient to prove some of the essential facts of the capital crime charged, and another witness or witnesses testify to facts relevant and sufficient to prove the remaining essential facts, the jury may find that the statute has been satisfied." State v. Schutte, 97 Conn. 462, 468, 117 A. 508; State v. Cots, 126 Conn. 48, 57, 9 A.2d 138; State v. Malm, 142 Conn. 113, 118, 111 A.2d 685.

There was ample evidence, independent of either confession, that the capital crimes charged had been committed, and also evidence to corroborate the essential facts stated in the confessions. A summary of the evidence includes the following: The defendants were together at Culombe's house on the afternoon of Saturday, December 15, 1956, the day the crimes were committed, and also in the evening of that day shortly after the bodies of the victims were found. That afternoon, the defendants had been seen bringing a television set into Culombe's house from his Oldsmobile. The set had been purchased by him on a deferred payment plan that afternoon in East Hartford. It was placed in the car with the help of the seller. Culombe paid for the set in full on the following Monday morning, December 17. The Oldsmobile was the car later identified by Culombe as the one in which he and Taborsky drove to, and returned from, New Britain on the evening of December 15. The sign on Kurp's gasoline station was as described by Taborsky in his confession. The body of Janowski was found in the toilet room;

there were two bullet wounds in his head. This corroborated Taborsky's description of the shooting. The body of Kurpiewski was found in the boiler room with one bullet wound in his head. The statements of both Taborsky and Culombe included these details of the crime. Janowski's car was found at the pumps in front of the station, facing south. Taborsky's statement put the car in that position. In this car was Janowski's little daughter. This fact corroborated statements made by both Taborsky and Culombe as to the presence of a child in the car. Taborsky stated that Kurpiewski was wearing a cap with a black visor. There was independent testimony that Kurpiewski had been wearing such a cap, and one was found with Kurpiewski's body in the boiler room. Both defendants said, when they were taken to the gasoline station after their confessions, that the location of the desk and the cash register had been changed. Other evidence confirmed it. Two guns were retrieved from the pond where Culombe said he had disposed of the guns used in the shootings, Taborsky having directed him to do so. One of the guns was identified by evidence independent of the confessions as the one from which certain parts found in Culombe's house had been removed. The other was identified by Taborsky as the gun he used to shoot Janowski. A raincoat with human bloodstains on it was found in a swamp where Culombe said he had thrown it. Most of the details contained in the confessions were established by independent evidence more than sufficient to satisfy the two-witness rule.

Taborsky assigns error in the refusal of the trial court to charge as he requested on the application of the two-witness rule and in the charge as given. The court charged the jury in accordance with the

law stated in the cases heretofore cited. This claim of error is without merit.

Upon error alleged in the denial of their motions to set aside the verdicts, the defendants claim that the court applied an erroneous rule pertaining to the standard of sanity or mental capacity of the defendants to commit the crimes with which they were charged. They urged the rule stated in *Durham* v. *United States,* 214 F.2d 862, 874; see *State* v. *Pike,* 49 N.H. 399. The court correctly charged the jury according to the rule stated in *State* v. *Davies,* 146 Conn. 137, 143, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S. Ct. 1441, 3 L. Ed. 2d 1537, and *State* v. *Donahue,* 141 Conn. 656, 664, 109 A.2d 364, cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257. In the *Davies* case, we reviewed and reconsidered our rule and rejected the *Durham* rule. The cases at bar furnish no reason for further consideration of our rule. The defendants, at the expense of the state, obtained experts of their own choice to testify on their mental capacity. The state also offered expert testimony on this subject. The jury could properly find that the defendants had the mental capacity required by the rule stated in the charge to make them criminally responsible for their acts.

On the claim that the evidence failed to establish the guilt of the defendants beyond a reasonable doubt, no further extended discussion of the testimony and the exhibits is required. The jury had before them the confessions and the testimony concerning the circumstances under which they were given, substantially as hereinbefore detailed in our discussion of the issue of their admissibility. There was ample evidence, independent of the confessions, not only to corroborate the facts stated in them but to supply additional facts pointing to the defend-

ants' guilt. Neither of the defendants took the stand to deny his guilt or to show that the proof offered by the state as to the crimes was not true. This was the right of each defendant and did not relieve the state from establishing guilt beyond a reasonable doubt. *State* v. *McDonough,* 129 Conn. 483, 487, 29 A.2d 582. A review of all the evidence establishes that the jury could find the guilt of the accused beyond a reasonable doubt as that term is defined in our cases. *State* v. *Smith,* 138 Conn. 196, 200, 82 A.2d 816, and cases cited.

Both the defendants assign error in the refusal of the court, upon their motions, to excuse George W. Hannon of East Hartford from sitting on the jury. After the examination of Hannon by the court and by counsel on the voir dire, he was accepted by all as a juror. Before the entire jury had been selected, and before the defendants had exhausted the challenges allowed them (General Statutes § 51-242), the defendants moved that Hannon be excused by the court because he had, as a member of the board of finance of East Hartford, participated in the adoption of a resolution offering a reward for the arrest of the perpetrators of a holdup and killing in that town. It developed later that the defendants were implicated in this crime. The examination of Hannon clearly indicated a lack of any prejudice. The most that can be claimed from the fact that he had participated in the adoption of the resolution offering the reward was, not that he was prejudiced personally against the defendants, but that he wanted the perpetrators of the crime apprehended and brought to justice. This is no more than any decent citizen would want. There was no abuse of discretion in the action which the court took in denying the motions to excuse Hannon as a

juror. *State* v. *Potter,* 18 Conn. 166, 175; *DeCarlo* v. *Frame,* 134 Conn. 530, 533, 58 A.2d 846. Taborsky complains because veniremen were not excused by the court when they admitted what his brief describes as "a preconceived notion of guilt" of the defendants. It is true that some of the veniremen stated on their examination on the voir dire that they had read accounts in newspapers and had heard and seen radio and television broadcasts which led them to an opinion of the guilt of the accused. They all stated under oath, however, that they could and would disregard any opinion they might hold and would decide the cases only on the evidence presented in court and under the court's charge. The examinations of these veniremen disclosed that their opinions or suppositions did not, in fact, incapacitate them from sitting as impartial jurors, and the court's ruling cannot be disturbed. *State* v. *Wilson,* 38 Conn. 126, 138; *State* v. *Willis,* 71 Conn. 293, 315, 41 A. 820; *State* v. *Klein,* 97 Conn. 321, 325, 116 A. 596.

Culombe claims error in a charge by the court to the effect that the jury, in weighing the opinions of the expert witnesses, were to take into consideration the fact that those opinions might be based wholly or in part upon statements made to the experts by the defendants, who, being on trial for their lives, were not disinterested witnesses and were not, when they made the statements, under oath. A similar charge was made in *State* v. *Saxon,* 87 Conn. 5, 20, 86 A. 590. In that case, the statements which furnished some basis for the experts' opinions were in evidence from the lips of the accused. In the present instance, some of the statements upon which the experts testifying in behalf of Culombe could have relied were in evidence from the testimony of the ex-

perts themselves as to the history given to them by Culombe, and some from the lips of Culombe as a witness. No exception was taken to the charge, nor is there any reference made to it in the finding. Practice Book §§ 153, 398 and Form No. 559 (B). Nevertheless, we have considered it. The charge as given applied to the expert testimony on behalf of the state as well as on behalf of Culombe and was correct under the circumstances. See *State* v. *Kenyon,* 134 Conn. 43, 49, 54 A.2d 585.

Culombe also complains of the admission in evidence of a portion of a photograph taken of Kurpiewski as he lay dead on a stretcher. Culombe claims that the exhibit was so gruesome as to arouse the prejudice of the jury. The exhibit depicted facts material to the state's case, and the trial court did not abuse its discretion in admitting it. *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223, and cases cited; *State* v. *Smith,* 27 N.J. 433, 448, 142 A.2d 890.

There is no error in either case.

In this opinion the other judges concurred.