STATE OF CONNECTICUT *v.* FILLIPO TOMASSI

BROWN, C. J., JENNINGS, BALDWIN, O'SULLIVAN and DALY, Js.

Argued April 5—decided July 18, 1950

*V. Fenton Dooley,* with whom was *Thomas R. Robinson,* public defender, for the appellant (defendant).

*Arthur T. Gorman,* assistant state's attorney, with whom, on the brief, was *Abraham S. Ullman,* state's attorney, for the appellee (state).

BROWN, C. J.   The defendant and Joseph Celso were jointly indicted for murder in the first degree for the killing of Samuel S. Kahan during an attempted robbery.   The defendant's motion for a separate trial was granted.   The jury rendered a verdict of guilty of murder in the first degree and the defendant has appealed, assigning error in the court's charge, rulings upon evidence and denial of his motion to set aside the verdict.

We summarize the facts which the state offered evidence to prove and claimed to have proved and which were uncontroverted by the defendant.   Sometime prior to February 2, 1949, the defendant and Celso formulated a plan for robbing Kahan's jewelry store at 65 Congress Avenue, New Haven.   In pursuance of the plan, revolvers and cartridges were procured, and at about 8 o'clock in the morning of February 2 they proceeded to the store.   The defendant carried a fully loaded .38 caliber revolver, and Celso a fully loaded .32 caliber revolver as well as two fishline sinkers in a cloth or sock.   They entered the store and held up Kahan, who began to shout.   Celso struck him with the sinkers and, when he continued to shout, the defendant shot him twice.   One bullet penetrated his left arm and the other entered his left chest, passed through the lung and lodged in the lower portion of the spinal cord. About 9 a. m. Kahan was removed to the New Haven

Hospital, and the police, who arrived at the store shortly after, found a discharged .38 caliber bullet and two fishline sinkers on the floor. About 5 p. m. the police took the defendant into custody in his room, which was near the store. In his bureau drawer they found the two revolvers mentioned above. They also found in his room forty-eight loaded .38 caliber cartridges, which remained out of a box originally containing fifty. The defendant was identified as the purchaser of the box at Bassett's store in New Haven on the preceding day. The police also found cartridges fitting the .32 caliber revolver and a bottle of cleaning fluid with a wet rag which the defendant had used to clean his gun directly after the shooting. The bullet found on the floor of the store and the one subsequently removed from Kahan's spinal canal had been fired from the .38 caliber revolver found in the defendant's room. They were the two bullets missing from the original fifty the defendant had purchased the day before.

Upon Kahan's arrival at the hospital it was found that his spinal cord was almost entirely severed, with the result that he was completely and permanently paralyzed from the waist down. He could not move his legs and his bladder and bowels did not function normally. Major operations were performed on the spinal canal for the removal of the bullet and on the chest for the drainage of large quantities of blood which had lodged there. As a result of the bullet wound which necessitated these operations, certain constituent changes occurred in Kahan's blood stream. During the course of his stay at the hospital, in the latter part of February, a thrombophlebitis or blood clot formed in Kahan's right leg. A portion of this clot broke off and entered the blood stream, causing a pulmonary embolism. Kahan's death ensued on March 10, 1949.

The chief controversy upon the evidence presented to the jury was whether the wounds which the defendant inflicted were the cause of death. Upon this issue the state made the following claims of proof. The thrombophlebitis resulted from Kahan's general debility, from his immobility by reason of paralysis, and from certain constituent changes in his blood stream, all of which were caused by the gunshot injuries. The primary cause of death was the wound in the left chest, which resulted from the bullet's traversing the lung and lodging in the lower portion of the spinal cord. The secondary cause of death was the pulmonary embolism. The defendant's claims were these: Thrombophlebitis may be caused by a number of different factors — amongst others, bad nutrition, age and anemia. On or about February 20, 1949, the chest wound traversing the lung was healing well. The thrombophlebitis, from which Kahan was suffering between February 20 and March 10, was not diagnosed by any of the physicians in charge of his care and treatment. On March 10, while he was undergoing massage, a thrombus was dislodged by the manipulation of the physiotherapist. The thrombus upon dislodgment then became an embolus, which traveled through the blood stream until it lodged in the pulmonary artery, causing a pulmonary embolism which resulted in Kahan's death. In summary, the state claimed that the bullet wounds inflicted by the defendant were the cause of death, while he claimed that it was not the wounds but the treatment employed by the doctors at the hospital which caused it. He contends that the court's charge upon the issue of the cause of death was insufficient because it failed to instruct the jury adequately as to the effect of what he claimed was the negligent treatment accorded Kahan in the hospital.

The defendant objected to the charge in accordance

with § 156 of the Practice Book. Specifically, he has assigned error in this instruction by the court: "One other thing I must say to you in this connection, and that is that it does not necessarily follow that a wound is not the cause of a death simply because there was negligence in the treatment of the wound or of the wounded man. A dangerous wound, one which is calculated to endanger and destroy life and which naturally leads to a death, is the cause of the death even though it appears that the deceased might have recovered if he had taken proper care of himself, or that unskilled or negligent treatment has aggravated the wound or contributed to the death. As I have said before, it is not essential that the wound be the sole cause of the death. So where a wound, either operating directly or indirectly, by causing some other condition which produces death, has been a substantial factor in causing a death, it is still to be regarded as the cause of the death even though some negligence in the treatment of the wounded man by physicians and others is also a contributing factor." This part of the charge immediately followed a full and correct statement, as to which no error is assigned, of the relevant legal principles applicable to the determination of the issue of the cause of death. In the course of these instructions, the court said: "[E]ven though death follows a wound, in point of time, if the death is brought about by some cause independent of the wound, if it would have happened, that is, if there had been no wound, then of course the wound is not the cause of death. . . . [I]t is not essential that the wound be the sole cause of death. It is not essential that it be the immediate cause of death. It is essential that it be a substantial factor in bringing about the death." After the instruction complained of, the court recited in detail the conflicting claims upon the evidence and

explained the application to them of the principles of law which it had stated.

The court's instructions gave the defendant all he was entitled to and were correct. One who has wilfully inflicted upon another a dangerous wound, with a deadly weapon, from which death ensued, is guilty of murder or manslaughter, as the evidence may prove, although, through want of due care or skill, the improper treatment of the wound by surgeons may have contributed to the death. *Commonwealth* v. *Hackett*, 2 Allen (84 Mass.) 136. We have approved this principle and added: "From these and other authorities, it is apparent that it is not necessary that the act or omission should be the direct cause of death; it is sufficient if it be a contributory cause." *State* v. *Block*, 87 Conn. 573, 576, 89 A. 167. That the foregoing is in accord with overwhelming authority is illustrated by these more recent citations: *People* v. *Kane*, 213 N. Y. 260, 270, 107 N. E. 655 (a mass of supporting authority is reviewed); *State* v. *Richardson*, 197 Wash. 157, 164, 84 P. 2d 699; *Hall* v. *State*, 199 Ind. 592, 607, 159 N. E. 420; *Commonwealth* v. *Williams*, 304 Pa. 299, 302, 156 A. 86; note, 126 A. L. R. 916; 26 Am. Jur. 193. The underlying principle is that one who intentionally inflicts a wound calculated to destroy life, and from which death ensues, cannot throw responsibility for the act either upon the carelessness or ignorance of his victim or upon unskillful or improper treatment which aggravated the wound and contributed to his death. *State* v. *Bantley*, 44 Conn. 537, 540.

The defendant did not take the stand during the trial. In its charge the court told the jury that an accused could either testify or not as he saw fit and then continued: "In considering the question of guilt or innocence of that accused person, however, the jury may take into consideration the fact that the accused did

not testify. That is so if the State has made out a prima facie case. That is, if the State by its evidence has made out a case which to you, as reasonable men and women, appears to call for some denial or explanation from the accused himself; and if under those circumstances the accused has failed or refused to testify and has thereby avoided cross-examination, you are then permitted to take his failure to testify into consideration and draw therefrom whatever inference as to his guilt or innocence is reasonable." The court added that there was no burden upon the defendant to prove his innocence. The defendant has assigned error in the instruction quoted. The gist of his complaint, as stated in his brief, is that the jury were improperly given to understand that they might draw unfavorable inferences "from his failure to explain matters of which he could not reasonably be expected to have cognizance," particularly with relation to "the causal connection between the shooting and the death." This contention overlooks the express limitation in the court's language, which, in effect, instructed the jury that they might draw inferences only from the defendant's failure to explain matters which reasonably appeared "to call for some denial or explanation from the accused himself." Obviously, these did not include the question of causal connection between the shooting and the death.

The propriety and need for this instruction are to be tested by the finding. While it is true that the parties have stipulated for the purposes of this appeal that only the evidence bearing upon the causal relation between the shooting and the death should be printed and that the evidence not printed would support the verdict in all other respects, the fact remains that the state's uncontroverted claims of proof, recited above, apparently depend for vital support on the defendant's confession.

Both in the trial court and before us, the defendant has urged that this confession was improperly admitted in evidence and has questioned the probative effect of its contents. Accordingly, while the state's claims of proof relating to such facts as the plans and preparations for and the execution of the attempted robbery, including the defendant's shooting of Kahan, all of which were fully within the defendant's knowledge, are not challenged by express claims in the finding to the contrary, the burden rested upon the state to prove these material facts beyond a reasonable doubt. Under the circumstances, the instruction complained of was fully warranted and was sufficient. *State* v. *Heno,* 119 Conn. 29, 34, 174 A. 181; *State* v. *Ford,* 109 Conn. 490, 496, 146 A. 828.

In referring to the possible verdicts which the jury might render, the court said: "There are four verdicts, any one of which, so far as the law is concerned, it is possible for you to reach with reference to this case. You will bear in mind that the indictment charges the accused with murder in the first degree. The statute, however, provides that the jury before which any person is indicted for murder in the first degree may find him guilty of homicide in a lesser degree than that charged. Now that does not mean that if the facts found by the jury to have been proven make it a case of murder in the first degree, that then the jury may return a verdict of guilty of a lesser degree of homicide simply because they want to. The jury is bound under its oath to return a verdict in accordance with the evidence, and if the evidence which is believed by a jury makes out a case of a certain degree of homicide, the jury must return a verdict of homicide in that degree and not in a lesser degree. What the statute means is this, that if on an indictment such as the one here for murder in the first degree, the facts found

proven by the jury do not justify a verdict of guilty of murder in the first degree but do justify a conviction of a homicide in a lesser degree, the jury may and should bring in a verdict of guilty of that degree of homicide which the evidence does justify. In that sense, therefore, the jury in this case may bring in a verdict as regards this accused, either of guilty of murder in the first degree or of guilty of murder in the second degree or of guilty of manslaughter, or of not guilty." As the court went on to say it would do, it subsequently explained the elements of murder in the first degree, murder in the second degree and manslaughter and the sort of evidence necessary to justify a conviction for each of these crimes.

The defendant complains that by these instructions the court "took from the jury its prerogative of deciding the facts and assessing the degree of the crime with which the accused stood charged." This calls for determination of the meaning of § 8350 of the General Statutes. This section, after prescribing what shall constitute murder in the first degree and murder in the second degree, states that "the degree of the crime shall be alleged in the indictment; but the jury before which any person indicted for murder shall be tried may find him guilty of homicide in a less degree than that charged." Since the statement that "the degree of the crime shall be alleged in the indictment" precedes the provision that the jury before which the one indicted is tried "may find him guilty of homicide in a less degree than that charged," the natural meaning of the latter provision is that on the theory that the greater offense includes the less, and to avoid the needless expense and delay of a further trial or trials upon a new indictment or information, the jury may determine the case under the original charge by finding the accused guilty of the lesser offense where such a conviction is

warranted and is the only one warranted upon the evidence. To hold otherwise would do violence to the reasonable meaning of the language used and to pertinent statutory provisions and common-law principles and would impinge upon the jurors' oath prescribed by § 3576 to return a verdict "according to law and the evidence before you." It would be in conflict with the direction in § 7969 that "The court shall decide all issues of law and all questions of law arising in the trial of any issue of fact; and, in committing the cause to the jury, shall direct them to find accordingly, and shall submit all questions of fact to the jury . . . without any direction how they shall find the facts." It would involve a departure from the principles as to the respective functions of court and jury recognized by our decisions concerning offenses other than murder. *State* v. *Gannon,* 75 Conn. 206, 234, 52 A. 727, and cases cited; *State* v. *Pinagglia,* 99 Conn. 242, 244, 121 A. 473; *State* v. *Lougiotis,* 130 Conn. 372, 376, 34 A. 2d 777. We conclude that the explanation of the meaning of the statute contained in the charge was correct. The dictum in *State* v. *Dowd,* 19 Conn. 388, 393, predicated upon an earlier statute which included materially different provisions, does not require a different conclusion. In so far as our statement in *State* v. *Rossi,* 132 Conn. 39, 44, 42 A. 2d 354, is in conflict with the view expressed herein, it is overruled.

The defendant's complaint concerning the court's employment of the word "killing" instead of the word "murder" in explaining the fifth essential element of first degree murder is without merit. The court after defining the first two essentials stated that the third essential was that the killing must be unlawful, that is, without extenuation or excuse, and that the fourth was that it must be done with malice aforethought. Manifestly, any killing where the four essential elements

defined by the court were established would be murder, and, if it was done in attempting to perpetrate robbery, that, as the fifth essential element, would render it murder in the first degree under the terms of § 8350. The word "killing" as used by the court was correct and sufficient.

After the court had instructed the jury concerning the credibility of witnesses and the determining of the facts from their testimony, it continued: "You are then in duty bound to draw from those facts inferences as to the existence or non-existence of other facts; inferences, that is, which are reasonable." The defendant claims that this instruction was erroneous because it suggested that the jury must, instead of might, draw reasonable inferences. While we have stated that " it may be the duty of the trier to infer"; *Saunders* v. *New England Collapsible Tube Co.,* 95 Conn. 40, 44, 110 A. 538; we have usually indicated that the jury are entitled to or may draw fair and reasonable inferences. *State* v. *Murphy,* 124 Conn. 554, 562, 1 A. 2d 274; *State* v. *McDonough,* 129 Conn. 483, 486, 29 A. 2d 582; *Kinderavich* v. *Palmer,* 127 Conn. 85, 87, 15 A. 2d 83; *Dumochel* v. *Becce,* 119 Conn. 175, 177, 175 A. 569; *Ruerat* v. *Stevens,* 113 Conn. 333, 338, 155 A. 219; *White* v. *Herbst,* 128 Conn. 659, 661, 25 A. 2d 68. The charge should be considered as a whole. *Kerin* v. *Baccei,* 125 Conn. 335, 337, 5 A. 2d 876. So considered, it suggests that the court in using the language complained of had in mind emphasizing the jury's right to draw reasonable as distinguished from unreasonable inferences. This is indicated by these subsequent statements in the charge: "[Y]ou are then permitted to . . . draw [from the defendant's failure to testify] whatever inference as to his guilt or innocence is reasonable." "If, upon all of the evidence, you draw the inference. . . ." Repeatedly the court emphasized in the charge that the

state must prove beyond a reasonable doubt every essential element of the offense in order to convict. In this connection it stated: "If you can, in reason, reconcile all of the facts proved with any reasonable theory consonant with the innocence of the accused, then of course you cannot find him guilty." The instruction complained of did not constitute prejudicial error. *State* v. *Murphy,* supra, 566; *McMahon* v. *Bryant Electric Co.,* 121 Conn. 397, 406, 185 A. 181.

Error is assigned in the court's instruction concerning the defendant's confession in evidence. The defendant contends that the instruction failed sufficiently to inform the jury as to the evidential value of the confession. "Such a statement . . ., while it cannot be regarded as the equivalent of direct testimony, is some evidence, circumstantial in its nature, of the truth of the fact contained in it and under the circumstances of a particular case may be sufficient evidence of that fact." *Perrelli* v. *Savas,* 115 Conn. 42, 44, 160 A. 311; *State* v. *LaLouche,* 116 Conn. 691, 696, 166 A. 252; *State* v. *Willis,* 71 Conn. 293, 306, 308, 41 A. 820. The court's instruction was in accord with the principle established by these authorities and sufficiently informed the jury of the evidential value to be attributed to the confession.

Error is also assigned in the court's refusal to instruct the jury, as requested, that "the illegal detention of the accused prior to his confession" and "inducements or promises" made to him while so held were to be considered in determining the weight and credibility to be accorded the statement. It is undisputed upon the claims of proof in this connection that on February 14, 1949, while the accused was in custody in the New Haven County jail, under authority of a proper mittimus issued by the City Court of New Haven, he was transported to the state's attorney's office in New Haven

by Detective Mulhern pursuant to a letter issued from that office, and that while there he made and signed the confession in evidence. The state claimed that earlier that day, at the jail, he had been advised by his sister to tell the entire truth concerning the affair and that it was at his request that he was transported to the state's attorney's office, where he freely and voluntarily made and signed the confession. The defendant claimed that before his removal from the jail promises of favor had been extended to him and that the confession was induced by them and was involuntary. A party is not entitled to have granted a requested instruction which assumes the truth of disputed facts or facts which have no support in evidence. Conn. App. Proc. § 64. It does not appear from the only relevant claims of proof, by which the right of the defendant to have his request granted must be tested, that he was entitled to have the jury instructed either that his detention was illegal or that inducements or promises were made to him. Even if his detention was illegal, that would not of itself be sufficient to affect the validity of the confession. *State v. Zukauskas*, 132 Conn. 450, 459, 45 A. 2d 289. In so far as inducements or promises are concerned, as appears from our discussion below of the admissibility of the confession, there was no evidence of any which affected its validity. The court did not err in refusing to give the instruction requested.

But one further assignment of error as to the charge calls for consideration. The defendant filed a request that the jury be instructed to disregard the state's attorney's argument commenting upon the failure of the defense to produce evidence of Dr. Homans' opinion that immobility is the proper treatment for thrombophlebitis. The request was predicated upon the claim that the evidence offered by the defendant concerning Dr. Homans' opinion had been withdrawn and that

therefore any reference to it in argument by the state was unwarranted. We do not so construe the record. The defendant did withdraw a proposed offer of an excerpt from Dr. Homans' book but failed effectively to withdraw from the record the suggestion of his counsel in an earlier question, addressed to Dr. German on cross-examination, that according to Dr. Homans it was "of the utmost importance to keep the patient quiet in bed." While the court in its instructions to the jury at the time of the defendant's withdrawal of the offer of the excerpt went beyond the withdrawal actually made, we cannot hold that it erred in later refusing the instruction requested, particularly in view of the defendant's failure to object at the time of the argument complained of. *State* v. *Murphy,* 124 Conn. 554, 568, 1 A. 2d 274; *State* v. *Kemp,* 126 Conn. 60, 83, 9 A. 2d 63.

Two of the assignments of error relate to the court's rulings on evidence. Under the first, the defendant claims that the court erred in excluding the questions asked by his counsel of the defendant's sister as to what Detective Mulhern said to her about her brother. This claim finds full answer in the testimony given by her shortly after without objection: "Mr. Mulhern said, 'Tell the truth and things will be better for you [referring to the defendant].'" Under the second, the defendant claims that the court erred in admitting his confession, because it was induced by promises of favor from the state. The promise relied upon, which was the only claimed inducement, was this statement by one of the policemen having the defendant in custody: "Tell the truth and he [the assistant state's attorney] will treat you right." As we expressly held in 1936, by "the great weight of better reasoned authority" such a statement made to the accused does not render his confession inadmissible. *State* v. *Palko,* 121 Conn. 669, 680, 186 A. 657. That what we then said holds true of

subsequent authority on this point is shown by the following citations, chosen from a number which might be mentioned. *Watkins* v. *State*, 199 Ga. 81, 87, 33 S. E. 2d 325 (1945); *Smith* v. *State*, 248 Ala. 363, 366, 27 So. 2d 495 (1946); *State* v. *Thompson*, 227 N. C. 19, 24, 40 S. E. 2d 620 (1946); *Boone* v. *Nelson*, 72 F. Sup. 807, 810 (1947); *Martin* v. *United States*, 166 F. 2d 76, 78 (1948); 3 Wigmore, Evidence (3d Ed.) § 832; 20 Am. Jur. 438, § 508; 22 C. J. S. 1435. We reiterate what was stated in the *Palko* case, supra, with relation to a similar statement made to the accused: "As has been well said, such advice 'cannot possibly vitiate the confession, since by hypothesis the worst that it can evoke is the truth, and there is thus no risk of accepting a false confession.' 2 Wigmore, Evidence (2d Ed.) § 832." The court did not err in its rulings upon evidence.

The defendant's final claim is that the court erred in refusing to set aside the verdict. As already stated, under the stipulation of the parties the only issue to be determined under this assignment is whether the evidence warranted the jury's finding that the shots fired by the defendant were the cause of Kahan's death. In view of our recital above of the claims of proof and of our consideration of the charge upon this issue, an extended discussion of the evidence would serve no purpose. The defendant directs attention to the principle that, since to warrant a verdict of guilty "the evidence must be such as to establish the guilt of the accused beyond a reasonable doubt, . . . any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused, must prevail." *State* v. *Guilfoyle*, 109 Conn. 124, 139, 145 A. 761. Relying upon this, he urges that Kahan's old age, or his bad nutrition or anemia, which existed prior to the shooting, may have given rise to the thrombosis and ultimately resulted in his death, and that since this con-

clusion would be consistent with the innocence of the accused it must prevail. The record contains no evidence, however, sufficient to support this contention. As is pointed out in the *Guilfoyle* case, a mere "possible hypothesis" of innocence will not suffice. The defendant's other contention is that the treatment given Kahan in the hospital was such as to constitute an independent cause of death which, under the principle laid down in the court's charge, was effective to break the causal connection. The evidence was ample, however, to support beyond a reasonable doubt the jury's contrary conclusion. The uncontroverted unanimous opinion of the three medical experts that the primary cause of death was the gunshot wounds was a part of the evidence to this effect. The evidence was sufficient to support the verdict, and the court did not err in refusing to set it aside.

There is no error.

In this opinion the other judges concurred.