STATE OF CONNECTICUT *v.* ROBERT B. TRAUB

BALDWIN, C. J., KING, MURPHY, SHEA and ALCORN, Js.

Argued October 5—decided December 18, 1962

*James D. Cosgrove,* public defender, for the appellant (defendant).

*George D. Stoughton,* assistant state's attorney, with whom, on the brief, were *John D. LaBelle,* state's attorney, and *J. Read Murphy,* assistant state's attorney, for the appellee (state).

KING, J. The defendant, Robert B. Traub, was convicted of statutory arson. General Statutes §§ 53-82, 53-83. During the trial, three written confessions were admitted in evidence, each over Traub's objection. The basic claims of error in this appeal relate to the admission in evidence of these confessions.

The validity of the court's rulings admitting the confessions depends on the facts surrounding the making of the confessions. Although the case was tried to the jury, the facts with respect to the admissibility of the confessions are those found by the court, since it is settled that the preliminary question of the competency—that is, the admissibility—of a confession is a question for the court, although the weight to be accorded the confession, if the court admits it, is for the jury. *State* v. *Devine,* 149 Conn. 640, 650, 652, 183 A.2d 612; *State* v. *Lorain,* 141 Conn. 694, 699, 109 A.2d 504; see *Rogers* v. *Richmond,* 365 U.S. 534, 548 n., 81 S. Ct. 735, 5 L. Ed. 2d 760.

On May 14, 1960, seven fires of suspicious origin occurred in Hartford. One of them was in a building known as 94-96 Park Street, and another, which

took place a little earlier in the evening, in a building at 144-150 Front Street in which Dante's Restaurant was located. At about the time of the Park Street fire, Traub had been seen in the area, and apparently suspicion fell on him. On May 16, while Traub was sitting in a tavern drinking beer, Patrick Conroy, a detective in the Hartford police department, asked Traub to go outside to a police cruiser, and he voluntarily did so. Conroy and Edward M. Curtin, Jr., a captain in the Hartford fire department, asked Traub about various fires, and he denied that he had set any. Conroy and Curtin were not satisfied with all of Traub's answers and wished to question him further at police headquarters. Traub willingly went with them. He had had only two small beers in the tavern, and there is no claim that he was not in a condition to talk intelligently or to choose whether or not to talk at all. Daniel Leary, a police detective, took Traub outside the station and questioned him further. He was thereafter arrested at the police station and charged with breach of the peace, and bond was set. The next day, May 17, he was presented in the Hartford Police Court, his case was continued, and, in default of bond, he was taken to jail. There is no claim that the police had any belief that he was guilty of breach of the peace except as it might be involved in the greater charge of arson; but the custom then followed was to use breach of the peace as a sort of "holding charge" to permit further investigation.

## I

The first claim of the defendant is that the confessions were inadmissible because they were made while he was illegally under arrest, or illegally de-

tained, or both. Under § 6-49 of the General Statutes, a police officer is empowered to arrest, without a prior complaint or warrant, "any person for any offense . . . when such person is taken or apprehended in the act or on the speedy information of others," or "any person who such officer has reasonable grounds to believe has committed or is committing a felony." Where the right to arrest without a warrant is regulated by statutory provision, such an arrest except as authorized is illegal. *Sims* v. *Smith,* 115 Conn. 279, 284, 161 A. 239. Section 6-49 does not authorize an arrest on mere suspicion. *State* v. *DelVecchio,* 149 Conn. 567, 575, 182 A.2d 402; *State* v. *Carroll,* 131 Conn. 224, 231, 38 A.2d 798. The state in its brief practically concedes that under the circumstances Traub should not have been arrested on a breach of the peace charge. No charge of arson was made against him until more than a week later, on May 24 or 25. The arson information in the Police Court contained seven counts, each covering a different one of the fires occurring during the evening of May 14. Traub was bound over to the Superior Court on May 25. A new information was thereafter filed, containing but two counts of arson, the first count based on the fire at 94-96 Park Street and the second count on the fire at 144-150 Front Street.

It would appear not unlikely that Traub's initial arrest on the breach of the peace charge was in violation of § 6-49 and contrary to article first, § 10, of the constitution of Connecticut, prohibiting arrests unless they are "clearly warranted by law." It is not, however, necessary to pass on the legality of Traub's arrest or detention, since even if illegality is assumed, it is settled law that the existence of an illegal arrest and detention does not automa-

tically render inadmissible confessions made after the arrest or during the period of detention. *Stroble v. California,* 343 U.S. 181, 197, 72 S. Ct. 599, 96 L. Ed. 872, rehearing denied, 343 U.S. 952, 72 S. Ct. 1039, 96 L. Ed. 1353; *Gallegos v. Nebraska,* 342 U.S. 55, 60, 72 S. Ct. 141, 96 L. Ed. 86; *Wong Sun v. United States,* 288 F.2d 366, 371 (9th Cir.), cert. granted, 368 U.S. 817, 82 S. Ct. 75, 7 L. Ed. 2d 23, restored, after argument, to calendar for reargument, 370 U.S. 908, 82 S. Ct. 1254, 8 L. Ed. 2d 403; *State v. Guastamachio,* 137 Conn. 179, 183, 75 A.2d 429; *State v. Tomassi,* 137 Conn. 113, 126, 75 A.2d 67; *State v. Buteau,* 136 Conn. 113, 123, 68 A.2d 681, cert. denied, 339 U.S. 903, 70 S. Ct. 516, 94 L. Ed. 1332; *State v. Zukauskas,* 132 Conn. 450, 457, 45 A.2d 289. A collection of cases on the effect of delay in arraignment on the admissibility of confessions may be found in 19 A.L.R.2d 1331. Here, any such delay was in the arraignment on the charge of arson; there was no delay in the arraignment on the charge of breach of the peace.

There is nothing to indicate that Traub realized the possibility of there being any illegality in his initial detention under a breach of the peace charge instead of an arson charge. Nor is there anything to suggest that this irregularity or possible illegality had, or could have had, any coercive or compulsive effect on him or, for that matter, any effect on him at all, either with respect to the confessions or otherwise.

## II

We come now to what is obviously the crux of this case, that is, whether the totality of circumstances surrounding the making of any one of the confessions was such that that confession was not

"the product of an essentially free and unconstrained choice by the maker." *State* v. *Devine,* 149 Conn. 640, 653, 183 A.2d 612; *Culombe* v. *Connecticut,* 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037; *Lisenba* v. *California,* 314 U.S. 219, 241, 62 S. Ct. 280, 86 L. Ed. 166, rehearing denied, 315 U.S. 826, 62 S. Ct. 620, 86 L. Ed. 1222. Any possible illegality in Traub's arrest or detention, or in his having been "borrowed" from jail, as hereinafter explained, must be considered on the overall question of the voluntary character of the confessions. See cases such as *Payne* v. *Arkansas,* 356 U.S. 560, 562-567, 78 S. Ct. 844, 2 L. Ed. 2d 975. Unless the state has, in a given case involving a particular accused, proved that under all the circumstances a particular confession by him was voluntary, that confession is inadmissible under the fourteenth amendment to the federal constitution. This is true regardless of whether the confession was, or was not, probably truthful, or would, or would not, have been admissible under common-law rules as explained in cases such as *State* v. *Willis,* 71 Conn. 293, 306, 41 A. 820, for the fourteenth amendment is concerned with the individual rights of an accused, not with the probable accuracy of any confession he may make. *Culombe* v. *Connecticut,* supra; *Rogers* v. *Richmond,* 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760; see *State* v. *Devine,* supra. Perhaps the most convenient collection and summary of the holdings of the decisions of the United States Supreme Court on this constitutional question is to be found in an annotation in 1 L. Ed. 2d 1735, supplemented in 4 L. Ed. 2d 1833. The United States Supreme Court has, since these annotations were published, passed on the voluntariness of confessions in *Rogers* v. *Richmond,* supra;

*Reck* v. *Pate,* 367 U.S. 433, 81 S. Ct. 1541, 6 L. Ed. 2d 948; *Culombe* v. *Connecticut,* supra; and *Gallegos* v. *Colorado,* 370 U.S. 49, 82 S. Ct. 1209, 8 L. Ed. 2d 325, rehearing denied, 370 U.S. 965, 82 S. Ct. 1579, 8 L. Ed. 2d 835.

We turn now to a consideration of the facts surrounding each of Traub's three confessions in order to determine, as to each, whether it was truly voluntary under the proper constitutional test. It is important to note that no claim is made of any physical violence, threats of violence, unduly prolonged questioning, deprivation of food or sleep or similar misconduct or abuse by the police. Traub did claim that he was "hollered at," but this claim was not included in the finding and presumably was not credited by the court. In any event, Traub made no claim that he was intimidated or coerced by the "hollering," if in fact there was any. In our inquiry, we take the findings made by the trial court except for its findings and conclusions that the confessions were voluntary. These findings and conclusions we review in the light of the appendix to Traub's brief in order to make certain that the confessions were properly held admissible, as voluntary, under the test required by the fourteenth amendment. All of the testimony bearing on the admissibility of the confessions was presented to the court in the absence of the jury, and all material portions of that testimony appear to have been included in the transcript incorporated in Traub's printed appendix.

Traub chose to take the stand, and his testimony indicates that he was a man of at least ordinary intelligence, rather facile in the use of the English language, and well able to comprehend and respond to questions asked him by his counsel and, on cross-examination, by the state's attorney. Traub was

forty-one years old at the time of his arrest and single. He had been in a convalescent home from some time in January to some time in March, 1960, for what he called pneumonia. He was actually given no medication there but was treated as an alcoholic. There is no suggestion that he was mentally subnormal or deficient, although it may be that he was an alcoholic. He had been arrested several times before and was therefore not unfamiliar with the rudiments of pretrial criminal procedure. His prior criminal record is not disclosed in the court's finding, but on cross-examination he admitted convictions in 1940 for breaking and entering and taking a motor vehicle without permission, two convictions in 1941 for taking a motor vehicle without permission, and a conviction in 1947 on a similar charge. A question as to a conviction for kindling a fire in 1959 was excluded by the court on objection by Traub's counsel.

## A

Traub stresses, as an important surrounding circumstance, the so-called "borrowing" practice pursued by the police in this case. It consisted of taking Traub from jail, with his consent, to give him a lie detector test and to question him more conveniently at police headquarters or at the scenes of fires which the police suspected he might have set. His attack on the procedure is based on the fact that no release mittimus or warrant was used at the various times he was taken out of jail, nor was he, outside the jail, accompanied by the sheriff who, under the law as it then stood, was in charge of the jail. General Statutes § 18-32 (amended, effective Oct. 1, 1960, by Public Acts 1959, No. 152, § 40). Even if we assume that Traub was illegally "bor-

rowed," that fact, by itself, would not render the confessions obtained during the "borrowing" inadmissible. See *McNabb* v. *United States*, 142 F.2d 904, 909 (6th Cir.), cert. denied, 323 U.S. 771, 65 S. Ct. 114, 89 L. Ed. 616; *Tyler* v. *United States*, 193 F.2d 24, 29 (D.C. Cir.), cert. denied, 343 U.S. 908, 72 S. Ct. 639, 96 L. Ed. 1326. The "borrowing" practice may have been technically illegal, although there was oral testimony by the police officers that in this case it was authorized by an order of the judge of the Police Court of Hartford, apparently entered at the time of the arraignment of Traub on the breach of the peace charge. There is nothing, however, to indicate that Traub knew of any possible illegality in the practice, or that it in fact had any coercive or compulsive effect on him, either with respect to the confessions or otherwise. Its only effect was to permit questioning outside, instead of merely inside, the jail. Of course questioning, in and of itself, while an accused is in custody, is neither illegal nor improper. *Culombe* v. *Connecticut*, 367 U.S. 568, 576, 591, 81 S. Ct. 1860, 6 L. Ed. 2d 1037; *Lyons* v. *Oklahoma*, 322 U.S. 596, 601, 64 S. Ct. 1208, 88 L. Ed. 1481, rehearing denied, 323 U.S. 809, 65 S. Ct. 26, 89 L. Ed. 645. It is important to note that Traub's trips with the police and his interrogation by them outside the jail were with his consent and were in nowise claimed to have been compulsory or in the slightest degree against his will or desires.

### B

Traub makes much of the facts surrounding the lie detector test. On May 17, 1960, which was the day after Traub had first been approached by the police in the tavern, he was taken from jail to

police headquarters for further questioning. He had already been arrested and presented in the Hartford Police Court on the breach of the peace charge, his case had been continued, a bond had been set, and he had been remanded to jail. At police headquarters, Traub was asked by an un-identified man representing himself to be a lawyer and carrying a briefcase if he was willing to take a lie detector test, and he said he was. He did not sleep very well on the night of May 17 and asked for a bromide, which was given him at sick call at the jail on the morning of the 18th. That day, he was taken for the lie detector test. Although he claims that George Theroux, the private detective who gave the test, was not well qualified so to do, no deficiency in Theroux's qualifications could have injured Traub or have operated coercively on him. Cf. *Tyler* v. *United States,* supra, 31. Traub re-peatedly testified that he wanted to take the test and that he had so told the police. Prior to the test, he signed a written consent to take it. After the test, Theroux told Traub that its results were inconclusive. Traub explained that he had not slept well, was tired, and had received some medication from the jail physician. It was then agreed that he would take another test on the next day, May 19. After the first test, on the 18th, Traub accompanied John J. Nieb, a detective sergeant, to Park Street, where Traub was confronted with Mrs. Josephine Creed. Nieb testified that she did not identify Traub as a person whom she had seen in the area at about the time of the fire on Park Street. Traub was then taken back to the jail.

On the morning of the 19th, Traub took the second lie detector test at Theroux's office. It in-dicated deception as to certain matters. Traub

then signed, in Theroux's office, a confession that he had set the Park Street fire. He argues that the lie detector test was used to coerce him into confessing. The mere taking of such a test does not render a resulting confession inadmissible when the subject of the test has voluntarily agreed to submit to it. *Collins* v. *State,* 171 Tex. Crim. 585, 589, 352 S.W.2d 841, cert. denied, 369 U.S. 881, 82 S. Ct. 1152, 8 L. Ed. 2d 283; *Tyler* v. *United States,* supra. Cases on this point are collected in an annotation in 23 A.L.R.2d 1306, 1310. If elements of coercion are present, however, a confession, regardless of whether or not a lie detector is involved, is not voluntary and so would be inadmissible. *Bruner* v. *People,* 113 Colo. 194, 210, 156 P.2d 111. Traub repeatedly testified that he desired to take the test. But he now seems to claim that this desire was caused by a suggestion of the alleged lawyer that he take a lie detector test and that this suggestion constituted fraud which vitiated his consent to take the test. In the first place, the court did not find, nor was it compelled to find, that any suggestion, as such, was made. The finding was merely that Traub was asked whether he was willing to take a lie detector test and he said he was. But beyond this, there is no testimony in any way supporting Traub's claim that any such suggestion caused him to consent to take the test.

Traub apparently also claims that the suggestion of the alleged lawyer, when coupled with the "atmosphere" in Theroux's office on May 19, the day of the second voluntary test, amounted to fraud and deception vitiating the confession. He made no such claim in his testimony at the trial. Certainly he knew what the effect of the alleged fraud and deception was on him. Fraud and deception, even

if present, do not render a confession inadmissible unless they render it involuntary. If they render it involuntary, then of course there is a denial of due process and the confession is inadmissible. *People* v. *Everett,* 10 N.Y.2d 500, 507, 180 N.E.2d 556, cert. denied, 370 U.S. 963, 82 S. Ct. 1593, 8 L. Ed. 2d 830. Even if the circumstances related above were deceitful, they were not of such a character as to warrant a conclusion that the confession made in Theroux's office was coerced or was otherwise not the product of Traub's free choice. Cf. *Spano* v. *New York,* 360 U.S. 315, 319, 323, 79 S. Ct. 1202, 3 L. Ed. 2d 1265; *Leyra* v. *Denno,* 347 U.S. 556, 559, 74 S. Ct. 716, 98 L. Ed. 948, rehearing denied, 348 U.S. 851, 75 S. Ct. 18, 99 L. Ed. 671. Of course, the taking of the lie detector test is one circumstance in the totality of circumstances to be considered by us in determining whether the confession was truly voluntary.

## C

While Traub was at Theroux's office on May 19, and prior to his signing of the confession there, certain statements were made which he claims constituted promises or inducements. Apparently, he means to invoke the rule that confessions are considered involuntary as a matter of law and thus inadmissible if they have been induced by promises of leniency, advantage, reward, or immunity. *State* v. *Potter,* 18 Conn. 166, 178; *People* v. *Brommel,* 56 Cal. 2d 629, 632, 364 P.2d 845; note, 1 L. Ed. 2d 1735, 1742. During the trial, Nieb, as a witness, read from a police record which indicated that on May 19, after the second lie detector test was completed, he, Curtin and Theroux told Traub that people like him needed psychiatric help for their alcoholic con-

dition, and that Traub had then agreed that he did need such help. Nieb further testified that actually it was Traub who brought up the subject and who tried to convince them that he needed such care. Traub testified that Theroux told him he needed medical care and that a psychiatric test would be arranged for him, that Curtin and Nieb told him that he was run down and needed hospitalization and a doctor, and that Curtin told him, while he was being taken, later, to the scenes of the fires, that he needed hospitalization and that he, Curtin, would see that he was treated. Traub's counsel asked him the leading question as to what he did as a result of the remarks made to him about medical treatment, and Traub replied that that was when he signed the first confession. Although these statements as to medical treatment were not found by the court and may well not have been credited by it, they are wholly consistent with the specific finding of the court that no promises were made to Traub either in regard to the first confession or in regard to the second and third confessions. It does not appear that the possibility of providing Traub with medical care was in any way linked to any of the confessions or conditioned on his making a confession. See 23 C.J.S. 214, Criminal Law, § 825 (d).

After leaving Theroux's office, Traub was given lunch. At about 1 p.m. he was taken to police headquarters by Nieb and Curtin. There he signed a second statement confessing that he had set the fire at 94-96 Park Street. No threats or promises were made with respect to this confession. The next day, May 20, Traub was taken to the scene of the Park Street fire, where he orally admitted setting the fire and explained how he had done it. His explanation apparently partook of

the nature of a reenactment and, to the extent that it was, it is the equivalent of a confession under Connecticut law and is subject to the same preliminary requirements of proof of its voluntary character as a formal written confession. *State* v. *Doucette,* 147 Conn. 95, 98, 157 A.2d 487.

Traub was then taken to another section of Park Street, near the Paradise Restaurant, where another fire had occurred, and was asked about that fire. There he requested Nieb, who was accompanying him, for permission to speak to Rose Trapp, who ran a tavern in the area. She was called out to the police car, and Traub asked her if he had been in her tavern when the fire started. When she told him she could not remember, he told Nieb that he might as well admit having started the fires. Later, Traub was taken to Dante's Restaurant on Front Street, and started to admit, but then denied, having set a fire there. He was returned to jail before 4 o'clock in the afternoon, but about 6 o'clock he was taken to the detective bureau, where he was questioned for some three and a half hours about the fire at Dante's Restaurant. After denying that he set it, he finally admitted setting it and signed a confession to that effect. No promises or threats were made in connection with that confession. On the next day, May 21, he was taken to Dante's Restaurant, where he admitted, and in effect reenacted, the setting of the fire. Obviously, there is nothing here even suggestive of any coercion as to the confession on May 20 and the reenactments on May 20 and 21, or as to the confessions on May 19.

### D

Traub contends that there was a failure to warn him of his rights. In the first confession, there was

no statement acknowledging the possibility that the confession would be used against him, although such a statement was contained in the other two confessions. It is not clear whether Traub was advised, prior to his giving of the first confession, that it might be used against him. Nieb testified that prior to the taking of the second confession, Traub was "advised of his rights," i.e. he was advised that he did not have to make the statement or sign it. William Hippe, a police officer, testified that prior to the taking of the third confession, he advised Traub that anything he might say could be used against him, that he asked him if he wanted an attorney, and that Traub replied that he did not but that he would like one when he "came over" to Superior Court. The trial court made no finding as to whether Traub had or had not been advised of his right to remain silent. However, even if we were to accept Traub's claim that he was not warned of his right to remain silent and that what he might say would be used against him, this failure to warn would not, alone, be sufficient to render a confession involuntary, although it would have a bearing on that issue. *Culombe* v. *Connecticut,* 367 U.S. 568, 601, 81 S. Ct. 1860, 6 L. Ed. 2d 1037; *Payne* v. *Arkansas,* 356 U.S. 560, 567, 78 S. Ct. 844, 2 L. Ed. 2d 975; *State* v. *Guastamachio,* 137 Conn. 179, 183, 75 A.2d 429; *State* v. *Palko,* 121 Conn. 669, 680, 186 A. 657.

### E

Traub emphasizes the fact that he had no attorney until after the confessions had been made. He makes no claim that he had ever asked for counsel or that he was ever refused counsel or that any obstacle was placed in the way of his obtaining counsel. See *Culombe* v. *Connecticut,* supra, 630.

On this aspect of the case, the breach of the peace appearance in the Police Court is without significance. No plea was taken, no statements were made, there was no occasion for making any motions addressed to the complaint, and no prejudicial effects appear to have resulted from the defendant's lack of counsel. The whole breach of the peace proceeding seems to have fallen away, although by what exact procedural route is uncertain.

Traub was not arraigned on the charge of arson until May 25, four days after the last of the confessions and reenactments had taken place. Had he had counsel on May 16, before there had been any questioning of him, he would undoubtedly have been told to make no statements and in all probability would have followed that advice. In that sense, the confessions probably would not have been made but for lack of counsel. This, however, would be the situation in practically every case where, as here, there is no claim, nor basis for any claim, of physical violence, actual or threatened, which might overcome an instruction of counsel to an accused not to talk about his case. *Culombe* v. *Connecticut,* supra, 577; *Commonwealth* v. *Agoston,* 364 Pa. 464, 480, 72 A.2d 575, cert. denied, 340 U.S. 844, 71 S. Ct. 9, 95 L. Ed. 619. The fact that a confession is made prior to trial by one without the aid of counsel does not, alone, render the confession inadmissible. *State* v. *Buteau,* 136 Conn. 113, 120, 68 A.2d 681, cert. denied, 339 U.S. 903, 70 S. Ct. 516, 94 L. Ed. 1332. Indeed, Traub makes no claim to the contrary. The lack of counsel prior to Traub's making of the confessions is, however, one of a total combination of circumstances which must be taken into account on the overall question of voluntariness. *Reck* v. *Pate,* 367 U.S. 433, 441, 81 S. Ct. 1541, 6 L. Ed. 2d 948;

*Crooker* v. *California,* 357 U.S. 433, 438, 78 S. Ct. 1287, 2 L. Ed. 2d 1448, rehearing denied, 358 U.S. 858, 79 S. Ct. 12, 3 L. Ed. 2d 92; *Gallegos* v. *Nebraska,* 342 U.S. 55, 65, 72 S. Ct. 141, 96 L. Ed. 86. We conclude that there is nothing which indicates that the absence of counsel, during the period in which the confessions were made, in any way rendered them involuntary or other than the product of Traub's own free choice. None of the factors were present here which were present in cases such as *Gallegos* v. *Colorado,* 370 U.S. 49, 54, 82 S. Ct. 1209, 8 L. Ed. 2d 325, rehearing denied, 370 U.S. 965, 82 S. Ct. 1579, 8 L. Ed. 2d 835; *Carnley* v. *Cochran,* 369 U.S. 506, 82 S. Ct. 884, 8 L. Ed. 2d 70; *Chewning* v. *Cunningham,* 368 U.S. 443, 444, 82 S. Ct. 498, 7 L. Ed. 2d 442; and *Hamilton* v. *Alabama,* 368 U.S. 52, 53, 82 S. Ct. 157, 7 L. Ed. 2d 114. Cases regarding the constitutional obligations of a state to supply competent counsel promptly in criminal cases are conveniently collected in an annotation in 93 L. Ed. 137, supplemented in 2 L. Ed. 2d 1644.

One factor of considerable, although of course not of controlling, significance on the overall issue of the voluntary character of the confessions is that although Traub was questioned as to other fires which the police suspected were of incendiary origin, he did not confess to setting all of them but, instead, confessed to only seven, two of which form the subject matter of this case. It is quite obvious that had Traub felt under any compulsion to admit the setting of whatever fires the police asked him about, he would not, after confessing to seven, have denied the setting of others. This circumstance goes far to negate any "view that he had so lost his freedom of action that the statements made were

not his but were the result of the deprivation of his free choice to admit, to deny, or to refuse to answer." *Lisenba* v. *California,* 314 U.S. 219, 241, 62 S. Ct. 280, 86 L. Ed. 166, rehearing denied, 315 U.S. 826, 62 S. Ct. 620, 86 L. Ed. 1222.

There is nothing in the possible illegality of Traub's arrest and detention on the breach of the peace charge, in the "borrowing" practices, in the lack of counsel during the period in which Traub made his confessions, or in the circumstances surrounding the lie detector test which, either singly or in combination with the other circumstances, gives any support to his claim that the state did not prove that the confessions were voluntary.

We have made this independent examination of the evidence, notwithstanding the specific findings of the court that each confession and reenactment was voluntary, in order to be sure that Traub's trial was conducted in strict conformity with the full requirements of due process as applied to the admission of confessions, as set forth in the decisions of the United States Supreme Court which have been cited. Whether in fact the state has proven that a confession in any individual case is voluntary cannot be properly decided by a mere mechanical process of case-matching, although the factual settings of other cases are instructive. Great weight must be accorded to the determination of the trial court. It had the advantage of personally seeing and hearing the witnesses, including Traub. It could observe and weigh the strength or weakness of his personality and character in the light of his previous experience in criminal proceedings, and it could determine the credibility of all of the witnesses, including that of Traub. Considering the totality of the surrounding circumstances, we can

find no justification for disturbing the court's conclusion that the state proved that the three confessions were the voluntary statements of Traub, freely made of his own choice, and were not the product of coercion, inducements or improper or unfair tactics of any kind on the part of the police or anyone else.

## III

The claim that the verdict finding Traub guilty was against the evidence was not pursued in his brief and is so obviously without merit as to require no discussion.

There is no error.

In this opinion the other judges concurred.