STATE OF CONNECTICUT *v.* PAUL JACOBS
(11510)

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and GRILLO, Js.

Argued May 10—decision released July 31, 1984

*Richard Emanuel,* with whom, on the brief, was *Joseph Mirsky,* for the appellant (defendant).

*Robert A. Lacobelle,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

GRILLO, J. The defendant Paul Jacobs was charged in a substituted information with having committed, on April 11, 1980, the crime of manslaughter in the first degree in violation of § 53a-55 (a) (1)[1] of the General Statutes. The defendant pleaded not guilty to the information and elected to be tried by a jury of six. The jury returned a verdict of guilty as charged, and the defendant was sentenced on June 30, 1982, to a term of imprisonment of not less than four and one-half nor more than nine years. The defendant has appealed from the judgment rendered on the jury's verdict.

---

[1] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

The jury could reasonably have found the following facts from the evidence introduced at trial. The defendant and a companion John Megura were drinking at the Good Times Restaurant in Bridgeport during the evening of April 10, 1980. They had been drinking at the bar for about two hours when, at about midnight, the barmaid "shut them [both] off" because "they were getting loud and [she] felt they had had enough [alcohol]." A short time later, the victim Frank Martinsky, who was playing pool in the barroom, and Megura began to exchange unfriendly words. Megura walked to the pool table where he and the victim continued their verbal argument with some physical gesturing. A short time after the argument began, the defendant walked from the bar towards the pool table, displayed a gun and indicated that he would use it if the victim hurt his friend.

In response, the victim entered the restaurant's kitchen and reappeared with a butcher knife in his hand. Holding the knife in front of him, he began to back the defendant and Megura out of the bar. The defendant, still holding the pistol, and Megura, now holding a small buck knife, were backed out of the bar onto the sidewalk. They continued to argue with the victim, who stood inside the doorway of the restaurant. The defendant was standing on the sidewalk about six to eight feet from the victim when, holding his gun with two hands in a shooter's position, he fired a single shot into the victim's chest. The defendant fled the scene, but was apprehended a short time later. The victim was taken to a hospital where he died eight days later.

Officer James Walsh, one of the officers who apprehended the defendant that night, testified that after the defendant was located, he had to be carried to the car to be transported to police headquarters. Officer Walsh testified that he brought the defendant, "conscious, but uncooperative," to the police station and

turned him over to detectives Flynn and Giblin. Detective Giblin testified that he felt that the defendant was "highly intoxicated," but he could not state whether or not he smelled alcohol on the defendant's breath.

Detective Robert Biroscak, who interviewed the defendant at 9:30 on the morning of April 11, 1980, testified that the defendant was "[a]lert, and cooperative" that morning when he gave a statement. In his written statement, the defendant admitted that he had had "a couple" of drinks but that he was not intoxicated at the time of the shooting. He also admitted that he shot the victim in order "[t]o stop him from making a possible killing of John Megura."

On appeal, the defendant claims that the trial court erred when it (1) excluded the defendant's offer of proof on the cause of death issue, (2) refused to charge the jury on several lesser included offenses, and (3) failed to charge the jury on the defense of intoxication. We find no error.

In his first claim, the defendant maintains that the trial court erred when it excluded the proffered testimony of Eric Munoz, a physician, which would have shown that the cause of death was the grossly negligent medical treatment which the victim received while in the hospital.[2] The court refused to allow such testimony on the ground that evidence of gross negligence by treating physicians was immaterial and irrelevant unless it could be established that, as a matter of law, the mistreatment was the sole cause of death. In accord-

---

[2] We note that on May 13, 1982, the defendant requested and obtained a continuance during the trial so that he might present evidence as to his defense of the "gross malpractice here which resulted in the demise of the victim." The court reconvened on May 17, 1982, and at that time the defendant chose not to call his witness to the stand, but rather to make an offer of proof by way of a letter written by his expert, Munoz, which stated: "Had [the victim] been treated properly his chances of recovery could have been 80–90% (in other words at least 4 out of 5 patients with this same injury

ance with that ruling, the trial court declined to instruct the jury on the exculpatory effect of intervening negligent medical treatment. The defendant now argues that evidence of gross medical negligence which merely contributes to a victim's death is properly admissible under existing Connecticut law. Alternatively, he urges this court to overrule existing precedent and adopt a view which would allow such evidence to be introduced even if it cannot be established that the gross negligence was the sole cause of death. We disagree with the defendant's interpretation of Connecticut law. We refuse, moreover, to depart from decisional precedent.

John Klein-Robbenhaar, a doctor specializing in the field of pathology and certified by the American Board of Pathology in anatomic and clinical pathology, testified that, on April 19, 1980, he performed an autopsy on the body of Frank Martinsky. The doctor's findings as to the injuries caused by the bullet are not in dispute. He found that the bullet entered the victim's body in the left chest area, travelled through the diaphram into the left lobe of the liver, through the anterior and posterior wall of the stomach, and through the duodenum. It lacerated the left renal artery and vein and shattered the posterior aspect of the twelfth thoracic vertebra before it came to rest in the muscles of the back. Klein-Robbenhaar testified that the damage to the twelfth thoracic vertebra caused "within this particular victim, paralysis of both lower legs during his week that he was alive after the shooting"; and the injury to the renal artery, in and of itself, would have

---

if treated by the standard medical care in Connecticut would have survived). With the improper and negligent care he received, he died."

At best, the defendant's offer goes to show that the victim might have recovered if greater skill and care had been employed in his care and treatment. As Munoz indicated in his letter, there still would have been a 10–20 percent chance of the victim dying. This is exactly the type of conduct which does not relieve the inflictor of the wound from criminal liability. *State* v. *Tomassi*, 137 Conn. 113, 119, 75 A.2d 67 (1950); *State* v. *Bantley*, 44 Conn. 537, 540, 26 Am. Rep. 486 (1877).

caused death if untreated, as would the injury to the duodenum. Although the victim underwent surgery at the hospital, his surgeon apparently failed to repair injuries to both the renal artery and the duodenum. On April 18, 1980, Frank Martinsky died. Klein-Robbenhaar testified "that the cause of death in this particular person is a combination of a number of factors. One is the blood loss which created a state of shock; and two is the peritonitis that ensued after the small bowel blew out. Peritonitis gave rise to sepsis, blood poisoning, which in turn again aggravated the state of shock and ultimately—you know, caused his vital organs to cease functioning."

It is generally recognized that where death ensues from a dangerous wound inflicted upon another, it is ordinarily no defense that unskilled or negligent medical treatment aggravated the injury. The rule was first enunciated by this court in *State* v. *Bantley,* 44 Conn. 537, 540, 26 Am. Rep. 486 (1877): "If one person inflicts upon another a dangerous wound, one that is calculated to endanger and destroy life, and death ensues therefrom within a year and a day, it is sufficient proof of the offence either of manslaughter or murder as the case may be; and he is none the less responsible for the result although it may appear that the deceased might have recovered if he had taken proper care of himself, or that unskillful or improper treatment aggravated the wound and contributed to his death."

The *Bantley* rule has been repeatedly followed by this court and appears to be in accord with the majority position in other states on this issue. See *State* v. *Tomassi,* 137 Conn. 113, 75 A.2d 67 (1950); *State* v. *Leopold,* 110 Conn. 55, 147 A. 118 (1929); *State* v. *Block,* 87 Conn. 573, 89 A. 167 (1913); 100 A.L.R.2d 785–86. In *Bantley,* the victim suffered a severe gunshot wound to his arm between the shoulder and the elbow. He was treated at a hospital and died eleven days later from

lockjaw. The medical testimony differed radically as to the manner in which the wound should have been treated. The defendant requested the court to charge the jury that if they "should find that the death of [the victim] was the result or consequence of willful mismanagement or gross carelessness on the part of the attending surgeons, they could not find the accused guilty of manslaughter, as charged in the information." *State* v. *Bantley,* supra, 537. The trial court refused to instruct the jury as the defendant requested but charged "that if they should find that the accused willfully, and without justifiable cause, inflicted on [the victim] a dangerous wound, from which death would be likely to ensue, and if they should find also that his death did in fact ensue from and was caused by the wound, and not from any other cause, carelessness and mismanagement of whatever character on the part of the attending surgeons would be immaterial, and the treatment of the case by them, whatever it may have been, could not avail the accused as a defense." Id., 537–38. This court found no error on the part of the trial court in refusing to give the defendant's charge as requested or the instructions as given to the jury.

In *State* v. *Tomassi,* supra, 118, this court reiterated the *Bantley* rule and further clarified it by finding no error in that portion of the charge to the jury which stated: " '[I]t does not necessarily follow that a wound is not the cause of a death simply because there was negligence in the treatment of the wound or of the wounded man. . . . [I]t is not essential that the wound be the sole cause of death. So where a wound, either operating directly or indirectly, by causing some other condition which produces death, has been a substantial factor in causing a death, it is still to be regarded as the cause of the death even though some negligence in the treatment of the wounded man by physicians and others is also a contributing factor.' " Gross maltreat-

ment by attending physicians constitutes a defense only in the exceptional case where that maltreatment is the sole cause of the victim's death. See 100 A.L.R.2d 786 § 7; *State* v. *Tomassi,* supra, 118.

In the present case, there can be no doubt that the injuries inflicted by the gunshot contributed to the victim's death. As to the cause of death, Klein-Robbenhaar stated that the "cause of death in this particular person is a combination of a number of factors." Even if we accept that the hospital's failure to repair certain injuries to the renal artery and duodenum also contributed to the victim's death, it is clear that these injuries were caused by the bullet and would not have occurred but for the shooting incident. The wound itself contributed to the victim's death in a substantial way; see *State* v. *Tomassi,* supra, 118; and the defendant was unable to offer evidence to prove that the claimed gross negligence was the sole cause of death. Accordingly, the trial court did not err when it excluded the defendant's offer of proof on the cause of death.

The defendant also claims that the court erred in failing to instruct the jury that they might consider the defendant guilty of several lesser included offenses including manslaughter in the second degree and various assault offenses.

Prior to the charge to the jury, the state filed a written request to charge on the offenses of assault in the first degree, § 53a-59 (a) (3), assault in the second degree, § 53a-60 (a) (1) and assault in the third degree, § 53a-61 (a) (1) and (2).[3] The defense also filed a writ-

---

[3] General Statutes § 53a-59 states in pertinent part:

"ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when . . . : (3) under circumstances envincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person."

General Statutes § 53a-60 states in pertinent part:

"ASSAULT IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty

ten request to charge, but it was limited to the issue of justification. At trial, the jury was instructed on the elements of manslaughter in the first degree, § 53a-55 (a) (1), assault in the first degree, § 53a-59 (a) (1) and assault in the second degree, § 53a-60 (a) (2). Immediately following the charge, the state took exception and requested orally that the jury also be charged on manslaughter in the second degree, § 53a-56 (a) (1). Defense counsel joined in this oral request.

The formulation for determining a defendant's entitlement to a lesser-included offense instruction is set forth in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). The four-part test provides that "[a] defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser."

of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

General Statutes § 53a-61 states in pertinent part:

"ASSAULT IN THE THIRD DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person."

We note that these statutes concern an act of a defendant which causes the "serious physical injury," rather than the death, of a victim.

The court's failure to charge on manslaughter in the second degree was justified since an "appropriate instruction" was not requested. "Prior to the beginning of the arguments, sufficient copies of written requests to charge the jury must be filed with the clerk . . . ." Practice Book § 852. Absent such a request, the refusal of the court to so charge is justified. *State* v. *Johnson,* 188 Conn. 515, 528, 450 A.2d 361 (1982).

With respect to the lesser-included assault offenses which the charge did not discuss,[4] we find that the fourth prong of the *Whistnant* test was not satisfied because there was not a sufficient dispute in the evidence concering the cause of death. Since we have concluded that the trial court properly disallowed evidence pertaining to the hospital's alleged negligence, the jury could not reasonably have found that the victim's death was not caused by the act of the defendant in shooting him.

Equally without merit is the defendant's claim that the trial court erred when it failed to instruct the jury on the defense of intoxication.[5] Since the defendant did not file a request to charge nor take an exception to

---

[4] The defendant maintains that the first prong of *Whistnant* was satisfied by the state's written request to charge on the various assault offenses, since *Whistnant* requires that an appropriate instruction be "requested by either the state or the defendant." *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). For purposes of this case, we have permitted the defendant to avail himself of the state's request to charge. For future cases, however, we revise the first prong of *Whistnant* to require that a party claiming error in the failure to charge on a lesser-included offense must *himself* have filed a written request. This revision is in accordance with the general principle that a party may rely only upon his own actions in preserving a claim of error, and not upon those of his opponent.

[5] The defendant admitted firing the single shot at the victim and offered at trial evidence in support of the defense of justification (self-defense) and defense of others. It is reasonable to conclude that the defendant's failure to request a charge on intoxication was motivated by trial strategy, since the intoxication defense is inconsistent with those defenses offered by the defendant. To have proffered an intoxication charge would have substantially diluted the defendant's claim of self-defense and defense of others.

the trial court's charge, we refuse to review this claim of error. See Practice Book §§ 852 and 854; *State* v. *Gerak,* 169 Conn. 309, 316, 363 A.2d 114 (1975).

There is no error.